## Juker *et al. versus* Commonwealth *ex rel.* Fisher.

1. Where the Act of incorporation of a religious society is silent as to the mode of conducting elections of its trustees, the corporation may direct by by-law the manner of its performance; but, when no such provision has been adopted, the usage of the society in holding such elections will govern.

2. Where two such elections for trustees were held on the same day, one held before persons designated in the manner customary with the congregation, and held at the usual place, and the other at another place, the persons having a majority of votes at the election conducted at the usual place and in the usual manner are to be considered as duly elected over others voted for at a different place of election, though the persons holding the latter election were excluded from the usual place of election, and though the latter had a majority of all of the votes cast at both places of election.

3. It having been provided in the 4th section of the Act of incorporation of the Church of the Holy Trinity, in the city of Philadelphia, That the members of the church having subscribed to the building of the same, or who shall hereafter contribute not less than ten shillings annually towards the support of the church, shall meet at a time designated in the Act, in each year, at such place in the said city as shall be appointed by the trustees, of which notice to be given, and choose by ballot eight lay trustees by a majority of members so qualified to vote: It was *held* that persons who only a few days before the election, or less than a year before it, had contributed ten shillings or more to the support of the church, but who had not for several years before been contributors, were not annual contributors within the meaning of the Act, and were not entitled to vote, either at the election for trustees or at the preliminary meeting for the election of officers to conduct it, though their contributions severally were made with a *bonâ fide intention of becoming members of the church.*

4. Only those persons who were duly chosen to conduct the election for trustees were qualified to hold it; and therefore persons claiming to have been elected trustees at an election held before persons not so qualified, would not be legally elected.

5. A person, not a trustee of the church, who said on his *voir dire* that he had no particular interest, but only a general interest, in the event of an issue pending to determine who were the rightful trustees of a corporation,—that he had promised to contribute towards the payment of counsel and the

[*Juker et al. v.* Commonwealth *ex rel.* Fisher.]

expenses of the suit, and what he had to pay was "paid already." It was *held* that he was a competent witness in the issue.

6. Where the only question at issue regarded the qualifications of the respective persons claiming to be the rightful trustees of the church, it was illegal to admit testimony offered with the view of showing that a conspiracy existed in the church, having in view the transfer of the property of the corporation to the bishops and priesthood of the Roman Catholic Church, such conspiracy not being shown to be connected with the election in question.

ERROR to the Common Pleas of *Philadelphia.*

This was an issue directed between the Commonwealth of Pennsylvania, *ex relatione* John G. Fisher and others, as plaintiffs, and Francis Juker and others, as defendants, in the matter of a *quo warranto,* issued at the suggestion of the complainants against the respondents, alleging that they had been duly elected "The Trustees of the German Religious Society of Roman Catholics of the Holy Trinity Church in the City of Philadelphia," and that the respondents had usurped the office, and praying that they may be called upon to show by what authority they claimed to hold the office.

The respondents in their plea denied that the relators were elected trustees of said church, and also alleged that *they* themselves had been duly elected to the office of trustees, and had entered upon the duties of their office, and had not usurped the same, but exercised their office of legal right. To this plea a replication was put in, an issue to the country was formed which was tried by a jury, when a verdict was rendered in favor of the relators, and a judgment of ouster was given on the verdict.

On the 4th of October, 1788, a Religious Society, whose place of worship is at the corner of 6th and Spruce streets, Philadelphia, was incorporated by an Act of the Legislature, entitled "an Act to incorporate the members of the Religious Society of German Roman Catholics, of the church called the Holy Trinity in the city of Philadelphia."

The title of the corporation was directed to be "The Trustees of the German Religious Society of Roman Catholics of the Holy Trinity Church in the city of Philadelphia."

By the 3d section of the Act it was, *inter alia,* provided that the future trustees of the said corporation shall be and consist of the eldest pastor of the said church for the time being, duly appointed, and of eight lay members of the congregation, worshipping in and contributors to the said church, to be appointed and elected in the manner hereinafter mentioned.

By the 4th section of the Act it was enacted, "that all and every the members of the said church, having subscribed to building of the same, or who shall hereafter contribute any sum of money, not less than ten shillings annually, towards the support of the said church, shall meet *on Monday* immediately next *after* Whitsunday, which will be in the year of our Lord one thousand

2 s 2

seven hundred and ninety, and so on in every year for ever thereafter, at such place in the said city as shall be appointed by the said trustees, whereof notice shall be given in the said church, at the beginning of divine worship, on Whitsunday in the morning, and then and there shall choose by ballot the said eight lay trustees in manner aforesaid, by a majority of those members qualified to vote as aforesaid, who shall so meet between the hours of one and three of the clock in the afternoon," &c.

The officers or persons who were to conduct the election were not designated in the Act.

By the sixth section, *inter alia*, power was given to a majority of the trustees to make rules and regulations for the management of the temporal business, the government of their schools, and disposing of the estate of said corporation, as to them shall seem proper.

On the 9th June, 1851, an election was held for the election of eight lay trustees for one year, and the relators and respondents each claimed that they were legally elected trustees for the ensuing year.

It was alleged on the part of the defendants in error, that the difficulty in question arose out of a design formed to divert the purposes of the charter, and to take the management of the church property from the legitimate control of the laity, with the view of placing it in the exclusive control of the clergy. See report in 2 *Parsons' Eq. Rep.* 65.

It appeared that on Sunday, preceding the 9th June, 1851, a notice was read from the pulpit of the church, that a primary meeting would be held *at the school-room* near the church building, on Thursday the 5th of June, 1851, next preceding Whitsunday, at one o'clock in the afternoon, for the purpose of electing officers to conduct the election on the following Monday, *in accordance with a custom which had for some time existed in the congregation.*

On Thursday there was a considerable collection of people in the school-room at one o'clock in the afternoon. About that time an attempt was made at an *organization* of the meeting, by appointing John G. Fisher, one of the relators, as chairman, and another person as secretary. Confusion ensued; some of the respondents objecting to the organization, on the ground that there were persons present who were not entitled to vote. A chairman and secretary were appointed, and the secretary of the corporation was called for to produce the books, and receive money from persons who desired to pay ten shillings and vote. The secretary was not present, and the person having the books in charge declined to produce them. The chairman appointed a committee to receive the money from those who wished to become members of the corporation. On the part of the relators it was alleged, that contributions were received only from the members of the congrega-

tion, or from persons who had formerly been members of it, and who desired to renew their connection with it. The meeting proceeded to elect officers to conduct the election. Whilst the election was proceeding, another portion of the members, called, on the part of the relators, the Bishop's party, went up stairs to another room, *in the same building*, and there another meeting was organized. It was alleged, on the part of the respondents, that no persons were allowed to go up stairs to that meeting, who were not then pewholders, or annual contributors to the support of the church, and who it was supposed had a legal right to vote.

On the part of the respondents it was alleged that at the meeting down stairs, of which Fisher was chairman, thirty-three persons, who each then paid ten shillings to a person or persons acting in the holding of the election, and which thirty-three persons were not then pewholders or annual contributors, were allowed to vote. At each of the meetings persons to conduct the election for trustees were elected.

On the following Sunday, being Whitsunday, a notice was read from the pulpit that an election would be held in the *school-room*, the place where the corporation elections had been usually held, between the hours of one and three in the afternoon, for the election of trustees.

On Monday, the party to which the respondents belonged, got possession of the *school-room* and closed the doors, opened the shutters, and a pane of glass was taken out of a window, and a notice posted outside that the polls were opened; and it was also announced to those outside. At this election, Juker and others, the respondents, were elected as trustees.

Persons who had elected officers down stairs in the school-room, demanded the school-room and desired a police officer to put them into possession. This being refused, they procured a table and placed it in the yard of the church, and held an election. It was alleged on the part of the *respondents*, that at this election seventy-five persons who were not then annual contributors were permitted to vote. At this election, Fisher and others, the relators, were elected as trustees.

It was alleged on the part of *the relators* that at the election *in the yard*, the highest number of votes given for any one person was 132, the lowest, 128.

At the election in the school-house, at which the respondents were elected, the highest vote given was 150. It was, however, alleged on the part of the relators, that 19 of the 150 votes were illegal votes, and if so, thus leaving 131 as the number of votes of pewholders at that election.

On the following Sunday, a certificate of the election of *the respondents* was given to the pastor, and the election was announced from the pulpit. A certificate of the election of the *relators* was taken to the pastor, who declined to receive it.

[Juker *et al. v.* Commonwealth *ex rel.* Fisher.]

The *respondents* entered on the duties of the office of trustees, and the proceeding in this case was instituted against them. The question in dispute was, which of the parties to the proceeding were the lawful trustees of the corporation.

On the trial, a number of bills of exception were taken.

The first was to the admission of William Steinmetz, called on part of the relators. He was objected to as incompetent, and being sworn on his *voir dire,* he said that he had no particular interest in the event of the suit; that he had a *general* interest in its event. That he had contributed money towards the payment of counsel. On his cross-examination he said all he did was *voluntary ;* that he promised in the beginning that he would contribute ; that he did not promise to pay in respect of the case lost or not. Nothing said about gaining the suit or losing it. "What we have to pay is paid already." The witness was admitted, and exception was taken.

It was proposed to ask a witness whether he knew that since the year 1850, two parties had existed in the Holy Trinity Church. Objection was made, and the objection overruled.

The 3d exception was taken to the question whether Juker belonged to one of the parties. The 4th was as to whether Fisher belonged to another of the parties. The 5th was as to whether the witness belonged to one of the parties, and *when* it began to exist. The 6th was as to a question as to whether a meeting was held to take a list of names to send to Harrisburg, with the view of having the church property conveyed to the Jesuits. The testimony referred to in the several bills was admitted.

A number of other bills of exception were taken to the *admission* of testimony, most of which was offered with a view to show a design to convey the church property.

A number of points were submitted on the part of the respondents.

The *first* one was, that under the Act of Assembly incorporating the church, no persons had the right to vote for officers to conduct the election or to elect them, except persons who had *annually* contributed not less than ten shillings to the support of the church.

The *second* point was that by the terms of the charter, requiring a contribution annually, was meant that that amount should be contributed yearly. The *third* was that the payment of ten shillings on the day for selecting officers to conduct the election, or on the day of election, when the person paying had not before paid anything for the support of the church, would not constitute such person a legal voter at either of the elections. The *fourth* was, that the payment of ten shillings on either the 5th or 9th June, 1851, to *the committee* appointed at the meeting of which Fisher was chairman, did not entitle the person to vote at either election. The *fifth* was, that no legal payment of the annual

[Juker *et al. v.* Commonwealth *ex rel.* Fisher.]

sum of ten shillings could be made to any other person than *the treasurer.* The *sixth* was, that if persons who were not members or pewholders, were permitted to vote at the election at which it was alleged the *relators* were elected, but who had paid $1.33 only on the 5th or 9th June, such election was void. *Seventh,* that if, at the meeting for the selection of officers to conduct the election of trustees, a large number of persons, who had not subscribed to the building of the church, or who had not thereafter contributed ten shillings annually towards the support of the church, were permitted to participate in the proceedings thereof, the individuals then designated to hold the election for trustees had no right to hold it, and the election would be void. The *eighth* was, that if persons not qualified, interfered with the proceedings of *the preliminary meeting at which Fisher presided,* persons who were pewholders and legal voters had the right to retire to another room *in the same building,* and select officers to conduct the election for trustees. *Ninth,* that if the persons selected up stairs in the school-house opened the polls, with free access to the window for all legal voters, and that the respondents had a majority of the votes there polled, then they were legally elected. *Tenth,* that if none but legal votes were polled at the election in the school-house for trustees, and the respondents had a majority of all the votes cast at both polls, they were legally elected trustees.

The Court charged the jury as follows:—

"That so far as the evidence of an intention to convey the church property can shed light upon the motives of the parties, that which the jury think shows the views of the parties conducting the election is proper for their consideration so far as to explain their actions."

In answer to the 1st and 2d points submitted by the defendants' counsel, the Court said they were answered in the affirmative.

In answer to the 3d point submitted by the defendants' counsel, the Court read and explained the 1st and 4th sections of the Act of incorporation, and said, "in our view, [this charter explains itself, whatever may be its terms. The corporation has no power but what is here given by its charter.

"In answering this point in relation to the persons who came to the meeting on the 5th of June, or at any time between that and the election, and paid ten shillings, if the jury find these persons came there with a *bonâ fide* intention of becoming members of the church, they were entitled to vote and were legal voters.

"But if the jury believe they came there and paid their money for the purpose of voting, then they would not be entitled to vote at either of the elections.

Vol. VIII.—62

[Juker *et al. v.* Commonwealth *ex rel.* Fisher.]

"It is not a question for us to determine as to the danger to the corporation and the rights of the church by this construction of the charter, and if the jury believe it was not the custom of the corporation to receive such persons as voters, it is a question of intention for the jury to decide as to the motive with which they paid their money—for if these persons come with the *bonâ fide* intention of becoming members of the church they had the right to vote."]

In answer to the 4th point put by the defendants' counsel, the Court said, ["the question is, whether the committee appointed on the 5th of June, by the meeting then assembled, had the right to receive the money offered by those who came to pay it and become members. If the jury should believe that the officers of the corporation refused to receive the money or to produce their books to the meeting when called for, then those assembled could appoint a committee, and this committee would have the right to receive the money from those who wished to pay and become members—there was a reserved power in the corporation to appoint such a committee. To answer this proposition in any other way, if the officers of the corporation should keep away and refuse to produce their books, would enable them to defeat an election. If the action of those paying their money to the committee was in good faith, then they could pay to this committee, and they would be entitled to vote."]

In answer to the 5th point the Court charged, ["I have answered this in my charge to the 4th point submitted."]

In reply to the 6th point submitted by the defendants' counsel, the Court said, "I have answered this proposition in referring the matter contained therein to the jury as one of intention. [If the jury believe these persons came there and paid their money with the intention of becoming members, then they had a right to vote."]

In answering the 7th point submitted by the defendants' counsel, the Court said, "my instruction is this, [if you find that a majority down stairs were not pew-owners, and a majority of those who voted for John G. Fisher were not qualified voters, then the meeting was void. But if a majority of those present were legal voters, and he was elected by a majority of their votes, it would be valid. If you find a majority were not *bonâ fide* voters, and they outvoted the legal voters, then the minority had the right to go up stairs and hold their meeting there. But if these were only outvoted by legal voters, then they had no right to go up stairs and hold another meeting; it would not be legal."]

"The custom of meeting the Thursday before the election for the selection of officers to conduct the election was binding upon them.

"Whether those in the room at the time of the election of Fisher were legal voters who voted for him, the jury must determine.

[Juker *et al. v.* Commonwealth *ex rel.* Fisher.]

The evidence of the respondents is, that there were a great many strangers there, but whether they voted or not you must decide. It is in evidence that 30 members were made that day, but whether they voted or not when Fisher was elected chairman, the jury will determine."

In answer to the 8th point submitted by the respondents' counsel, the judge said, "I have answered this point in my remarks on the last proposition. [The mere *presence* of those who were not voters would not authorize them to retire to another place to hold an election, and if they came and sided with the others, it would not invalidate the election, for it must depend on which party had the majority of legal voters."]

In answer to the 9th point submitted by the defendants' counsel, the judge said, "I have already answered this. [If the jury find that those persons were not legally elected on the 5th of June to conduct said election, then they would not be legally elected for that purpose."]

The 10th proposition submitted by the defendants' counsel was read by the judge, and he said, "This is answered in the negative. [If these men were legally elected on the 5th of June, then they had the right to hold the election, but if they were not, they had not. It is only those who were properly elected to conduct the election, who could hold it, and if those persons who held the election in the school-house were not duly appointed on the 5th of June to conduct it, the respondents would not be legally elected."]

Error was assigned to the admission of Steinmetz. The assignments from the 2d to the 23d related immediately or remotely to the proposed transfer of the corporation property. The 24th assignment was to the admission of a certain resolution of the board of trustees passed on 9th June, 1851. The 25th was to the *first paragraph* of the charge as quoted, and from the 26th to the 33d, the assignments related to the parts of the charge quoted and in brackets; a material one being the answer to the *third* point submitted, which was to the effect that if the persons, who, on the 5th June, paid ten shillings, and who were not then annual contributors, came to the meeting with a *bonâ fide* intention of becoming members of the church, they had a right to vote.

*Perkins* and *Parsons*, for the respondents.

*Remak* and *F. C. Brewster*, with whom was *Baker*, for the relators.

The opinion of the Court was delivered, May 13, by
WOODWARD, J.—The relators claimed to have been duly elected

Trustees of the Church of Holy Trinity, in the city of Philadelphia, at a charter election held on the 9th day of June, 1851.

The respondents deny this claim, and maintain that *they* were the duly elected trustees.

This writ of *quo warranto* was sued out to test the rights of the respondents to the office they claim; and on the trial a verdict passed, and judgment of *ouster* was rendered against them. It comes before us on a writ of error to the opinion of the Court on the various questions raised in the bills of exception. The precise issue between the parties has ceased to possess any other importance than as it affects the costs of suit; for the tenure of the respondents expired in June, 1852, when a new board of trustees was chosen, who are now the incumbents. It is understood, however, that the root of discord remains and is productive of bitter fruits to the congregation of Holy Trinity; and it is expected that, in administering the justice due to the parties in respect to the subordinate question of costs, we may be obliged to express opinions on the construction of the charter of this church which will contribute to the extirpation of that evil root. Undoubtedly, if the plaintiffs in error have demonstrated that the Court of Common Pleas committed any error in law whereby they were injured, though it were only to the extent of a bill of costs, it becomes our plain duty to reverse the judgment.

Two elections for trustees were held on the 9th of June, 1851, one in the school-house near the church, the other in the. open yard. The respondents were elected at the poll in the school-house —the relators at the other poll. Which were duly chosen?

In considering this question, I was at first impressed with the position assumed by the respondents in their 10th point, that they had a majority of all the votes cast at both polls, and were therefore duly elected. The fact is as they allege. In the school-room 150 votes were polled—in the yard 131—making the total vote polled 281. The lowest vote received by any of the respondents was 148, leaving but 133 for the highest of the relators.

. But, notwithstanding this fact, the learned judge denied the conclusion of the respondents, and held that it was only those who were properly elected to conduct the election who could hold it; and, if those persons who held the election in the school-house were not duly appointed on the 5th June to conduct it, the respondents were not legally elected. Was this a sufficient answer?

The Act of incorporation is silent as to the mode of conducting charter elections. The fourth section requires the electors to meet " on Monday immediately after Whitsunday in each year at such place as shall be appointed by the trustees, whereof notice shall be given in the church at the beginning of divine worship on Whitsunday, and then and there to choose by ballot eight lay trustees, by a majority of those members qualified to vote who shall so

meet between the hours of one and three o'clock in the afternoon;"
but the Act nowhere directs who shall conduct the election.    The
duty of annual elections being enjoined, the corporation had power
to provide for the mode of its performance.    This would have been
a proper subject for a by-law, but no by-laws seem ever to have
been adopted.    The practice of meeting on Thursday before the
election and appointing officers to conduct it, decorous and proper
in itself as tending to guard against confusion and disorder, is
without any express warrant in the charter.    Still, as it was a
usage designed to facilitate a charter duty, had long prevailed,
and especially as both the parties before us recognised it and
attempted to conform themselves to it, we see no objection to the
Court's giving it the force of a by-law and holding them to it.    It
follows then that the only legal election on Monday after Whit-
sunday was that which was held by officers duly chosen to conduct
it at the preliminary election of the Thursday previous.    If the
respondents had not a majority of the votes cast at *that* election,
it avails nothing that a greater number of votes were cast in their
favor at another irregular and unauthorized poll.    It is indeed a
general rule of elections that mere irregularities which do not tend
to affect results are not to defeat the will of a majority.    The will
of the majority is to be respected even when irregularly expressed.
But where law has prescribed the time and place of election and
designated the officers who are to conduct it, a majority may not
set up other officers and hold a separate election, for majorities as
well as minorities are bound by law.    The answer made by the
Court, therefore, to the respondents' 10th proposition was correct.

The question then recurs, why was not the election in the
school-house at which the respondents were elected the legal elec-
tion?

The answer of the relators is, that it was not held by the officers
duly chosen on the previous Thursday to conduct it.    But the
officers who conducted it were chosen on the previous Thursday
by German Roman Catholics belonging to Holy Trinity, who had
subscribed to the building of the church, or who had contributed
not less than ten shillings annually to its support.    To this it is
replied that, at that preliminary election, a large number of votes,
sufficient to change the result, were excluded, and that another set
of officers were thereupon chosen to conduct the election.    This is
met by the counter allegation that the only votes excluded were
those of persons who had recently paid ten shillings into the
treasury of the church, and were not *annual* contributors to its
support.    This brings us to the very core of this controversy.
What kind of pecuniary contribution qualifies a German Roman
Catholic belonging to Holy Trinity to vote at her charter elections,
and the preliminary meeting for the choice of election officers?

2 T

[Juker *et al. v.* Commonwealth *ex rel.* Fisher.]

This is the great question raised by the record, and the 4th section of the Act of incorporation must answer it.          ^

That section prescribes that "all and every the members of the said church, having subscribed to building the same, or who shall hereafter contribute any sum of money not less than ten shillings annually towards the support of the said church, shall meet on Monday next after Whitsunday in every year, * * * * * * and choose, by ballot, the said eight lay trustees by a majority of those members qualified to vote as aforesaid."

. The Court below held that persons who came to the election and paid ten shillings, with a *bonâ fide* intention of becoming members of the church, were entitled at once to vote, and of course the jury found, under this instruction, that the preliminary meeting of the 5th June, which excluded these votes, was not the legally conducted meeting, the officers chosen thereat not the proper officers to conduct the election, and the election held by them on the 9th June not the legal election, and so the respondents were *ousted.*

Was the instruction correct? Original contribution to the erection of the church, or contribution towards its support of not less than ten shillings *annually* are the statutory conditions of suffrage. Annually means year by year. How can a payment become *at once* a payment year by year? A lease reserving rent *quarterly*, and a bond stipulating for *annual* payments look to a succession of periodical payments. Why is not this charter to be construed in the same manner? Why should we not presume the Legislature looked to a series of payments, or at least to an interval of a year between the payment and the vote, seeing that they have used words which denote a series and an interval?

But there is a meaning above verbal criticism in this word "*annually*" as it occurs in this Act of incorporation. It was used to fence out intruders, and to guard against those abuses to which all religious corporations are exposed in times of excitement. A dissatisfied minority always looks for means of reform, and a charter that would enable them to manufacture voters on the election ground, by paying ten shillings a head, would be a very convenient instrument in their hands. The Legislature meant to furnish no such instrument in this Act. They never meant to subject the properties and the effective control of Holy Trinity to trustees whom a crowd of new comers, on paying down ten shillings apiece, might, in their wisdom or their passion, put into office. They meant rather that the trustees should represent the worshippers belonging to Trinity Church—those who had established themselves there, and had proved by deeds their intention to maintain and support the church, and hence the requirement, not merely of a payment of money, but of a payment of money *annually*.

The subscribers to the building before 1793 were the original voters. The "others," who, by the first section, are made corporators, are those who, from year to year, pay ten shillings to its support. It is the initiation fee, and it is to be paid a year in advance of a full enjoyment of corporate privileges. We have no doubt of the wisdom of this arrangement; but wise or not, *ita lex scripta est.* The individuals who offered to vote in virtue of payments made less than a year before were properly excluded. They had no right to meddle in the election, nor in any of the preliminary arrangements. If they intended to become members of the corporation the payment of their money was the incipient step and properly taken, but it did not introduce them to the privilege of voting. Suffrage in the civil state is dependent on time as well as taxes. Thus, under our constitution, twenty-one years of age, one year's state residence, ten days' district residence, payment of a tax within two years that shall have been assessed at least ten days before the election, are conditions of suffrage to which all members of society are obliged to conform. So in the case of aliens, though members of civil society and subject to our laws, *time* only can mature their right to vote. A religious corporation is a society; its charter its constitution; and its privileges are dependent on whatever conditions are clearly expressed. The conditions can no more be set aside and its privileges be reached by a short cut, than the conditions and privileges of our state constitution can be so treated. Every man must bide his time. And time is valuable for reflection, and as an emollient for exasperated passions. It often serves to restore Reason to his just dominion, and to open the ear to the voice of conscience. As an element in the administration of religious corporations it is too valuable to be dispensed with, and the Legislature having prescribed it, the Courts must insist on its observance.

We are of opinion, therefore, that the learned judge erred in the construction given to the 4th section, and that the preliminary meeting who declined to receive the votes of persons who had not paid the stipulated sum at least a year before they offered to vote did no more than it was their duty to do. The officers whom they appointed to conduct the election on the succeeding Monday did right also in rejecting all such votes.

There are various bills of exceptions to evidence that remain to be noticed.

The relators alleged that a conspiracy existed in Trinity Church to transfer the property of the corporation to the Bishops and Priesthood of the Roman Catholic Church, and the judge tried the cause as if the existence of such a conspiracy were the issue between the parties. Had that been the issue, I am inclined to think all the evidence mentioned in the bills of exception would have been competent; but, as the only question was as to the qua-

[Juker *et al. v.* Commonwealth *ex rel.* Fisher.]

lification of the electors of trustees, I do not consider any of it relevant. The trustees, whichever board was duly elected, would be governed by the charter, and could make no transfer or use of the property inconsistent with that fundamental law. The Court judged rightly, that the title to the office depended on the prior question, who had been duly chosen to conduct the election; but, in instructing the jury on that question, they mistook the true construction of the Act of incorporation. Undoubtedly the cause came down to a mere question of construction. How, then, was room found for a conspiracy? Of what consequence, in respect to the only real question before the Court, was the fact that parties existed in the church, one of which desired to transfer the property, and the other to retain it? I confess myself unable to see how all the evidence about those parties—their actings and sayings in respect to the alleged transfer of property—could be thought to touch a case that involved only the construction of an Act of Assembly. The case of The Commonwealth *v.* Woelpper, 3 *Ser. & R.* 29, is relied on as justifying this evidence. We have a very meagre report of the facts of that case, but we learn from the opinion of C. J. TILGHMAN that there were tumult and violence on the day of election—threats of bloodshed and confederacies of members, which the Court thought might have had a powerful effect in deterring peaceable people from going to the election, and that the previous meetings and conversations *were connected with what took place at the election.* The evidence was admitted solely on the ground of such connection, and the jury directed to disregard it if they did not see the connection.

But here were no tumult or disorder. It is not pretended that anybody was kept away from the election, or that any confederacies were formed to prevent voting. On the contrary, every qualified voter had the opportunity to vote at the poll in the school-house, and notice was given outside to encourage him to do so. Under these circumstances what was there to connect the alleged conspiracy about another subject-matter with the conduct of this election? We see nothing that could fairly supply that link; and without it such evidence is inadmissible, according to The Commonwealth *v.* Woelpper.

These observations apply to all the bills of exception except the first. In regard to that, it is enough to say that we deem the witness competent, but the evidence he delivered irrelevant.

The judgment is reversed, and a *venire de novo* awarded.

LOWRIE, J., dissented.